## ORR ET AL. *v.* STATE OF INDIANA.

[No. 10,448. Filed May 27, 1919.]

1. INFANTS.—*Dependent Child.*—*Statute.*—Although uncared for by both parents, a female child under the age of seventeen years is not a dependent child within the meaning of §1642 Burns 1914, Acts 1907 p. 59, providing that any girl under the age of seventeen years, who is dependent upon the public for support, or who is destitute, homeless or abandoned, shall be deemed to be a dependent child, where she has never been a charge upon the public, nor been destitute, homeless or abandoned, but has been sheltered and cared for by a grandparent, who desires to continue such care and protection. p. 249.

2. INFANTS.—*Neglected Child.*—*Statute.*—A child abandoned by its parents and who was taken by the grandparents into their home and treated as a member of their own family, is not a neglected child within the meaning of §1642 Burns 1914, Acts

1907 p. 59, defining a neglected child as one not having proper parental care or guardianship. p. 250.

3. INFANTS.—*Custody of Children.—Policy of State.—Province of Courts.*—It is not the province of the courts to determine generally what conditions or exigencies will warrant the state in seizing the children of its citizens and making them wards of the state, but it is a legislative function, which cannot be delegated to the courts. p. 251.

4. INFANTS.—*Neglected or Dependent Children.—Statute.—Proceedings.—Parties.*—Proceedings under §1642 *et seq.* Burns 1914, Acts 1907 p. 59, relating to dependent or neglected children, should not be prosecuted in the name of the state. p. 251.

5. PARENT AND CHILD.—*Custody of Child.—Hearing.—Notice.*—The relation of parent and child cannot be permanently severed in a proceeding to determine the custody of the child without notice to the parent. p. 253.

6. INFANTS.—*Custody.—Statute.*—Section 1646 Burns 1914, Acts 1907 p. 59, relating to dependent or neglected children, cannot be used for the purpose of determining a controversy between the mother and a grandparent as to who should have the custody of a child. p. 254.

7. PARENT AND CHILD.—*Custody of Child.—Rights of Parent.*—Under §8065 Burns 1914, §2518 R. S. 1881, the father, if living and a suitable person, is entitled to the custody of his infant children, but if he has abandoned them or is under disability, the mother, if she is a proper person, succeeds to the right of custody; but a grandparent, who has cared for a minor child and formed a great affection for it does not thereby become entitled to its custody as against a parent, unless a strong case is made against the parent. p. 254.

8. INFANTS.—*Dependent and Neglected Children.—Abandonment.—Evidence.—Sufficiency.*—In a proceeding under §1642 *et seq.* Burns 1914, Acts 1907 p. 59, to have an infant declared a dependent or neglected child, a mother who left home because of the cruel treatment of an insane husband *held* not to have abandoned or deserted her child, she having left it in the care and custody of the husband's parents. p. 256.

From Howard Circuit Court; *William C. Overton,* Judge.

Action by the State of Indiana against Villa Kathryn Orr and others. From a judgment for the state, the defendants appeal. *Reversed.*

*Donald P. Strode* and *Barnabas C. Moon,* for appellants.

*Ele Stansbury,* Attorney-General, and *John B. Joyce,* for the state.

On August 24, 1918, one Julia Sumption, the probation officer of Howard county, filed in the circuit court an affidavit, which is the basis of this proceeding.

The following is the substance of her affidavit: "Villa Catherine Orr is a female child under 17 years of age; the father of said child is Harry B. Orr, who is domiciled and is a resident in Howard County; the mother of said child is Catherine A. Orr, who is domiciled and is a resident in Pittsburgh, Pa.; said child is a dependent and neglected child within the meaning of the statute in such cases made and provided, in that her environment is such as to warrant the state, in the interest of said child, in assuming her guardianship, and she should be made a public ward by order of said court."

On the same day said probation officer filed in said court her statement, denominated "report." This report discloses that said child was three years of age on March 2, 1918; that her health is good; that her father's name is Harry Blaine Orr and his address 1501 N. Kennedy street, Kokomo, Indiana; that her mother's name is Kathryn Ellen Orr, whose address is unknown. Said report continues:

"Kathryn Ellen Orr, the mother of Villa Kathryn, deserted her and took up her residence in another state about a year ago. The father, Harry Blaine Orr, also neglected her; and as the family has always made its home with the parents of Mr. Orr, the care of the children fell upon

them. Leroy S. Orr and Mary E. Orr, grandparents of Villa Kathryn, are anxious to adopt her; and since I find that she is a dependent and neglected child, and their home altogether satisfactory, I recommend that she be made a ward of the court of Howard County until adopted."

On the same day, the child and her father being present in court, the mother being absent, the matter was submitted, and the court made the following record: "That the defendant was born March 1, 1915; that the environment of the defendant is such as to warrant the State of Indiana, in the interest of said defendant, in assuming her guardianship; and she is therefore made a public ward and a ward of the Juvenile Court; and it is ordered that the probation officer of this court place said child in the care and custody of Leroy Orr and Mary E. Orr, her grandparents, at 1501 N. Kennedy Street, Kokomo, Indiana, until the further order of the court."

On September 24, 1918, the mother of said child appeared in court and moved to set aside the submission, which motion was sustained. The cause was immediately resubmitted and thereupon the court made the following record: "The court having heard the evidence and being well advised in the premises finds that the defendant is a dependent and neglected child and that her environments are such as to warrant the State in assuming her guardianship and she is hereby made a ward of the Juvenile Court. And it is ordered that the Probation Officer place said child in the care and custody of Leroy Orr and Mary E. Orr, her grandparents, who live at 1502 N. Kennedy Street, Kokomo, Indiana, until the further order of the court."

The mother then filed a bond and took a term-time appeal, which she is prosecuting in the name of her child.

On October 19, 1918, presumably pursuant to §1635 Burns 1914, Acts 1907 p. 221, the trial court filed its special finding of facts. This document is voluminous and consists of fifteen consecutively numbered items. So much of the substance thereof as is essential to an understanding of our decision, is as follows: "Harry Orr and Kathryn Orr were intermarried in August, 1906, and are the parents of three children, of whom Villa Kathryn Orr is the youngest, she being three years of age. Leroy S. Orr and Mary Orr are the parents of Harry Orr. Continuously since their marriage and until August 15, 1917, the parents of these children made their home with his father, Leroy S. Orr. Shortly after the marriage of said Harry Orr and Kathryn Orr, he suffered a nervous breakdown. He spent some time in the West for his health and returned to the home of his parents, where his family had remained. About April 7, 1917, said Harry Orr was adjudged a person of unsound mind and was committed to the Central Hospital for the Insane at Indianapolis, Indiana, where he remained as an inmate until August 10, 1917, at which time he was paroled, not as cured, but as safe to be at large. When he was permitted to leave said hospital, he returned to the home of his parents where he continues to reside. All said children were born in the home of said Harry Orr's parents where they have lived until the present time. Said Harry Orr has not been able to furnish suitable support and maintenance for his wife and children, and his parents have furnished what he thus lacked, except that said Kath-

ryn Ellen Orr worked a few weeks and earned some money. Said Harry Orr and wife have no property. The grandparents at all times have treated their daughter-in-law and her children with uniform kindness, have helped to care for them at all times, and sometimes have cared for them entirely. A short time after the marriage of said Harry Orr and Kathryn Ellen Orr they commenced having disputes and quarrels and they continued to have them until their separation on August 15, 1918. As soon as said Harry Orr returned from said hospital he and his wife resumed their quarrels and she declared her intention of leaving. Just before August 15, 1917, she received a telegram that her mother at Pittsburgh, Pa., was sick. At her request said Leroy S. Orr furnished her the money to go to her mother. Her mother recovered in three or four weeks; but said Kathryn Ellen Orr sent for her clothes and since then has made her home with her said mother. Prior to leaving, said Kathryn Ellen Orr, knowing the physical and mental condition of her husband, did not make or try to make any arrangements for the care and support of her children, but left them with their said grandparents. She has not since contributed to their support except that she sent some Christmas presents to her husband for them and he returned the presents to her. Ever since June 15, 1917, Kathryn Ellen Orr has made her home with her mother and her brother at Pittsburgh, Pa., and is engaged in work there which takes her away from home every day. Her mother is sixty-three years of age and has no property. Her brother is thirty-five years of age, unmarried, and has no property except he may have a little money. Her mother and brother are willing to receive her

children into their home. Before said Kathryn Ellen Orr left her husband she corresponded with other men and was guilty of unfaithfulness to him; and she is not a suitable person to have the care and custody of her said children. Ever since a short time after the marriage said Harry Orr has been and still is nervous, irritable, suspicious, and mentally and physically unsound. He is now able to work at times and at times he has bad spells, at which times he is unable to work and is hard to get along with, and has been unfaithful to his wife; and he is an unfit person to have the care and custody of his said children. A strong attachment exists between said children and their said grandparents. Said Leroy S. Orr and his wife do not have much property; but they have good health and are suitable and proper persons to have the care, custody and management of said children. All said children have been, and still are, dependent upon said grandparents for support. Their surroundings and the condition and conduct of their parents have been such as to warrant the Court in making them and each of them wards of the Court. The defendant Villa Kathryn Orr is a neglected and dependent child under 12 years of age. Said grandparents had these proceedings brought for the reason that said Kathryn Ellen Orr had threatened to take said children, and said grandparents desired to gain such legal control of said children as would enable them to keep said children together and raise, care for, and control them; and they have thought that they might adopt them as their own children."

DAUSMAN, J.—By §1642 Burns 1914, Acts 1907 p. 59, the legislature has defined a dependent child as fol-

lows: "The words 'dependent child' * * *
1.   shall mean any boy under the age of sixteen
     (16) years, or any girl under the age of seven-
teen (17) years, who is dependent upon the public for
support, or who is destitute, homeless or abandoned."

There is no evidence tending to prove that Villa
Kathryn Orr is a dependent child as defined by said
statute. Indeed, the special finding of facts conclu-
sively shows that she is not a dependent child. She
has never been a charge upon the public. She has
never been destitute, homeless, or abandoned. Dur-
ing her entire life she has been in the home of her
grandfather, where all concerned lived together as a
common family. In that home she has been sheltered,
clothed and nourished, and (excepting the last year)
has had what is generally regarded as the greatest
blessing to a little child—a mother's care, and evi-
dently the trial court is strongly of the opinion that
the grandfather's home is the best place for her now.
Under these circumstances, the action of that court
in adjudging her to be a dependent child is wholly un-
warranted.

By §1643 Burns 1914, *supra,* the legislature has
defined a neglected child as follows: "The words
'neglected child' * * * shall mean any boy under
the age of sixteen (16) years or any girl under the
age of seventeen (17) years, (1) who has not proper
parental care or guardianship; (2) or who habitu-
ally begs or receives alms; (3) or who is found
living in any house of ill-fame, or with any vicious
or disreputable persons; (4) or who is employed in
any saloon; (5) or whose home by reason of neglect,
cruelty or depravity on the part of its parent or par-
ents, guardian or other person in whose care it may

be, is an unfit place for such child; (6) or whose environment is such as to warrant the state, in the interest of the child, in assuming its guardianship.''

With respect to clause 1 of this section of the statute, it might be contended that, since the father is insane and the mother away, the child is without proper parental care. But that contention is excluded by the undisputed evidence and the facts found by the court. The child was left by the mother in the custody of its grandparents, who have so great affection for the little girl that they desire to keep her even to the exclusion of the mother, and the grandparents are suitable persons to be entrusted with the child's care. It is not unusual for grandparents to take into their home grandchildren whose parents have been rendered unable through misfortune to provide for them. When a grandfather takes his grandchild into his home and treats it as a member of his own family, the relation between them becomes akin to that of parent and child. He is said then to stand to the child in the relation of *loco parentis*, and the doctrine of *loco parentis* has long been known to the law. 20 R. C. L. 593. Under the circumstances of the case at bar, there can hardly be a difference of opinion on the proposition that the child does not come within clause 1 of the statute under consideration.

The uncontroverted evidence, together with the action of the trial court, precludes any contention that the child comes within clause 2, 3, 4, or 5, and there is not even a suggestion to that effect.

It will be observed that the first five clauses of said §1643, *supra,* are specific, but the last is general.

"Environment" is a word of broad signifi-
3. cance. Just what the legislature intended by
this last clause we do not know. We assume,
however, that it did not intend thereby to confer
unlimited authority on the courts to determine arbi-
trarily and generally what sort of environment will
justify the state in assuming control of infants. It is
not the province of the courts to determine generally
what conditions or exigencies will warrant the state
in seizing the children of its citizens. To determine
and declare the general policy of the state on this
subject, is a legislative function which cannot be dele-
gated to the courts.

The courts are frequently required to determine
who shall have the custody of a child, as between ad-
verse claimants thereto, in divorce and *habeas*
4. *corpus* cases, but such cases must be distin-
guished from cases arising under the statute
now under consideration. Acts 1907 p. 59, *supra.*
This act must not be confounded with the act of
March 10, 1903, §1630 *et seq.* Burns 1914, or the act
of March 6, 1905, amended in 1917. See Acts 1903
p. 516; Acts 1905 p. 440, §1641 *et seq.* Burns 1914;
Acts 1917 p. 341. The act of March 10, 1903, relates
exclusively to children of the class commonly known
as juvenile offenders; the act of March 6, 1905, as
amended in 1917, relates exclusively to children of the
class commonly known as juvenile delinquents, and
neither of said acts has any application whatever to
the case at bar.

Evidently the three legislative enactments to which
we have just referred have been confused by the trial
court and by all others concerned in the prosecution
of the case at bar. The cause is entitled "The State

of Indiana v. Villa Cathryn Orr.'' The attorney who prosecuted the proceeding is designated in the bill of exceptions ''Attorney for the State of Indiana'' and ''Counsel for the State,'' and he has indorsed his approval on the bill. It does not appear by what authority the state was made a party to this proceeding, or by what authority said attorney appeared on behalf of the state, or by whom he was employed. Why was the three year old child made the defendant? Surely this baby is not a criminal, nor a juvenile offender, nor a delinquent child. If the proceeding be regarded as distinctively an action by the State of Indiana against the child, it is certainly unique. It appears from the record that the child was brought into court without the issuance of any writ, and the trial proceeded with no one to represent the helpless child defendant. The father was present at the first hearing, but everyone concerned knew him to be insane. The grandfather was present at that hearing, but he is the person who instigated the proceeding. A lawyer who knows the meaning and value of constitutional limitations should be quick to perceive the element of tyranny involved, and any man who has grown up under the protection of the federal and state Constitutions, and who is imbued with American ideas of civil liberty and endowed with a sense of fairness, even though he be not a lawyer, should intuitively know the danger of such unrestrained exercise of power.

Section 3 of the act applicable herein, Acts 1907 p. 59, *supra,* provides that: ''The Judge of the Juvenile Court in any County shall hear every case brought by any person, or by the Board of Children's Guardians, concerning a dependent child or a neg-

lected child.'' Section 6 provides that: ''Neither the Board of Children's Guardians, nor any other person bringing the case of a dependent or a neglected child before the court under the provisions of this Act, shall be liable for the payment of any court costs.'' These provisions of the statute indicate clearly that the legislature did not intend that the state should prosecute the proceeding.

The complaint was filed by one Julia Sumption, but it is clear that the grandfather is the real party in interest, and that the contest is between him and the mother of the child. He is seeking to bring about a situation which in his opinion will enable him to adopt the child without notice to the mother, thereby avoiding any resistance which she might otherwise make to the adoption. But the relation of parent and child cannot be permanently severed without notice to the parent. See *Van Walters* v. *Board, etc.* (1892), 132 Ind. 567, 32 N. E. 568; *Wilkison* v. *Board, etc.* (1902), 158 Ind. 1, 62 N. E. 481. When the proceeding was instituted the mother was temporarily in Pennsylvania. Her address was known to the grandfather, and if not known to the ''attorney for the state,'' he could readily have obtained it. But no effort was made to notify her, and she knew nothing of the proceeding until two weeks after the first hearing, when she received a letter from a neighbor informing her what had been done with her child. Thereupon she returned, and is making an effort to protect her natural and legal right.

The complaint charges that the child is a dependent and neglected child in that her environment is such as to warrant the state, in the interest of the child, in assuming her guardianship, and, in order to

gain possession of the child, the trial court has done the only thing it could do with any hope of success, viz., adjudged the child to be "a dependent and neglected child" within the meaning of clause 6 of §1643, *supra.*

The action of the trial court is strangely contradictory. Evidently the trial court was of the opinion that the home in which the child was living

6. was "altogether satisfactory," for he immediately recommitted the child to that home. If the trial court had found that the grandfather's home was not a suitable place for the child, and that the child's environment was bad because of the constant presence of its unfortunate, but insane, father, we could understand that the court was endeavoring to promote the welfare of the child. But, as the record stands, it is too clear for any difference of opinion that the controversy in reality is between the child's grandfather and its mother. The law provides ways by which such controversies may be properly presented and determined, but the statutes under which the proceeding was ostensibly brought cannot be used for that purpose.

The grandparents are to be commended for their kindness in assisting their unfortunate son and his family, but their affection for the child cannot

7. be permitted to prevail as against the mother, unless a strong case be made against the mother. *Gilmore* v. *Kitson* (1905), 165 Ind. 402, 74 N. E. 1083; 12 R. C. L. 1105 *et seq.* The relation of parent and child is not created by the law of the state. It is a natural relation, and in all civilized countries it is regarded as sacred. Of the many ties that bind humanity, that which unites the parent and the child is the earliest and the most hallowed.

The policy of the state, as declared by the legislature, is that the father shall have the custody of his infant children if he be a suitable person. But if the father be not living, or if he has abandoned his children, or if he be under disability, or if he be an unfit person to have the custody of his infant children, then the mother succeeds to the right of custody if she be a suitable person. §3065 Burns 1914, §2518 R. S. 1881. In the case at bar the father is insane, and that fact entitles the mother to assert her claim to the custody of her child.

We are impelled by a sense of duty to say that a gross injustice has been done this mother. In item 8 of its special finding the court says that prior to leaving the home of her husband's parents she knew the physical and mental condition of her husband, and did not make, or try to make, any arrangements for the care and support of her children. The uncontroverted evidence shows that statement to be unwarranted. The mother is thirty-one years of age. Her husband told her that she could not remain in the family and that she would have to leave. She discussed the matter with his father, who thereupon gave her money to pay her transportation to Pittsburgh, and advised her to go. In the presence of his parents, her husband accused her of improper conduct with men, and also made that charge concerning her to the neighbors. He addressed her in profane and offensive language. He made unconscionable demands upon her. He arrived home from the insane asylum on Friday, and she went away on the following Wednesday. While absent she corresponded with her husband, and also exchanged letters with his mother at least every two weeks and sometimes every week.

Her mother-in-law wrote her to take a nice long visit and not hurry about coming home, and at the trial testified that in her judgment it was best that she remain away. While at Pittsburgh she lived with her mother and brother. Her mother is sixty-three years of age. Her brother is thirty-five years of age, unmarried, and a reporter for a newspaper. When her mother recovered from her sickness, she obtained employment in a dry goods store, where she has worked continuously since. At Christmas time she sent clothing to the children, which her husband returned. Sometime in the following June she returned to Kokomo to visit her children, and remained about two weeks, during which time she went occasionally to the Orr home, but stayed most of the time with the neighbors. When she was about to return to Pittsburgh she desired to take the children with her to her mother's home, but Grandfather Orr said "No. You can't have them. I have had legal advice on that matter." He further testified: "I was vexed with her because she threatened to take the children away; and she knew I was attached to them. We were in constant fear that she would take the children away from us."

Under such circumstances it cannot be said that the mother abandoned or deserted her children, or that she made no effort to provide a place for them. Neither can it be said that she deserted her husband. His disposition and propensities are such that no intelligent and conscientious woman could live with him as a wife without completely sacrificing her sense of duty and propriety. The continued submission by a woman of normal sensibilities to the abnormal demands of an insane husband would destroy the last vestige of her self-respect and extin-

guish every humane quality. We are of the opinion that her course was the wise one to pursue.

In the tenth item of the finding the trial court makes the statement that the mother of this child, before she left her husband, corresponded with men other than her husband, and was guilty of unfaithfulness to him. This statement is very obscure, and is subject to various interpretations, but it is evident that the trial court intended it to be construed in a way detrimental to her. The fragment of a letter which had been partly burned was introduced in evidence. This fragment does not bear the name of any person, and so much of the document has been destroyed that no rational mind can legitimately draw the conclusion therefrom that she corresponded promiscuously with "other men." From the evidence in the record on this point it is impossible for any fair-minded person to draw any inference inconsistent with the presumption of her innocence. If by "unfaithfulness" the trial court intended to insinuate that she was guilty of adultery, that insinuation is utterly groundless. Several neighbors testified to her good character, and their testimony was not questioned. We cannot permit these findings to stand. The good name of a mother is precious not only to herself, but also to her children, and if it is to be smirched by a court record, that record must rest on something substantial.

The proceedings herein have been very irregular, but no one has questioned the right of the mother to prosecute this appeal. There is no evidence to support the action of the court in adjudging Villa Kathryn Orr to be a dependent or a neglected child.

Judgment reversed.