McCALEB, Justice.
 

 Margaret Jean and Marjorie Jane Knight, seven years of age, are the twin daughters of Mrs. Genevieve Knight of Shreveport, issue of her marriage with Marcus Knight, deceased.
 

 On December 13, 1945, Mrs. Ray Over-lees, paternal grandmother of the little girls, initiated this proceeding on behalf of the State in the Caddo Parish Juvenile Court to have them declared to be neglected children under Act No. 30 of 1924 because of the alleged immoral conduct of their mother during the latter part of 1944 and for the greater portion of 1945. Upon the charges contained in the affidavit of Mrs. Overlees, a trial was had in the Juvenile Court which resulted in a holding by the judge that the children are neglected within the meaning of the law. The judge, however, permitted Mrs. Knight to retain the custody of the children “subject to continued supervision of a Probation Officer of this Court as the Court shall see fit to direct from time to time”. Mrs. Knight has appealed from the adverse decision.
 

 The case was hotly contested below and much evidence was taken anent the charges of misconduct on the part of Mrs. Knight which forms the basis of the judgment complained of. We do not find it necessary to discuss the evidence at length inasmuch as we are convinced that, even though it be assumed that the findings of fact of the Juvenile Court are correct, the judgment cannot be maintained. However, a brief resume of the salient events which gave rise to the action of Mrs. Overlees is in order.
 

 Marcus Knight and Genevieve Bewley were married in May of 1938 and, in February of 1939, the twin girls, Margaret Jean and Marjorie Jane, were bom. From’’ the time of their marriage until December 1, 1945, Mrs. Knight and the two little girls lived (except for a very short period) with
 
 *182
 
 Mr. Knight’s mother, Mrs. Ray Overlees, and her husband. The marriage was not a happy one. While they were never legally separated, they were estranged in the sense that both the husband and wife, to the knowledge of each other, made engage-, ments or dates with other men and women while they were living under the same roof. During January 1944, Marcus Knight entered the military service and was killed in action about a year later.
 

 While her husband was in the armed forces, Mrs. Knight continued her practice of having dates with other men and particularly with a young aviator who was stationed at Barksdale Field during part of 1944 and up to September 1945. This young officer was married in March 1943 and had an infant son but, according to his testimony, he and his wife had not lived together for more than ten days when they became estranged.
 

 It is charged that Mrs. Knight and the young officer were constant companions; that they frequented cocktail bars, night clubs and amusement resorts; that Mrs. Knight drank intoxicating liquor and that she did not return home until after midnight on most of these occasions. Sometimes, according to Mrs. Overlees, Mrs. Knight did not come home at all.
 

 Mrs. Knight admitted these charges but asserted that she was not guilty of having sexual relations with the aviator or other men and denies that her conduct was immoral. She explains that, on the infrequent occasions that she did not come home, she spent the night with women friends.
 

 When Mrs. Knight was absent from home on dates with the officer, her little girls were admittedly well taken care of and Mrs. Overlees did not at any time complain that they were neglected. That is because all during the period of these asserted escapades, the children were in the care and custody of Mrs. Overlees and a colored maid employed by Mrs. Knight in the daytime to attend to the needs of her children.
 
 [1]
 
 But, in September 1945, relations between Mrs. Knight and Mrs. Overlees became very strained as a consequence of continual disagreements over financial and other matters. Finally, on December 1, 1945, Mrs. Knight moved from the apartment, which she occupied with Mr. and Mrs. Overlees, to the home of her mother, Mrs. E. A. Timón, and took her children with her. Mrs. Overlees began these proceedings less than two weeks thereafter.
 

 The trial judge declares in his written opinion that:
 

 “We do not find as a fact that there has ever been brought into the home of the children any immorality, nor drunkenness, nor other condition which would render
 
 *183
 
 their home environment unfit. They were not neglected in the care and supervision of Mrs. Overlees while in her home.
 

 “After their removal from the Overlees home, about December 1, 1945, they have lived with their mother in the home of their maternal grandmother, Mrs. E. A. Timón, on Southern Avenue and were there when this action was brought and are still there. There is no contention made, nor do we find any evidence of unfitness of Mrs. Timon’s home.”
 

 However, the judge finds as a fact that Mrs. Knight is an immoral woman in view of her nocturnal dates with married men and because she drank liquor and frequented night clubs on such occasions. He acknowledges that there is no proof of improper sexual relations between Mrs. Knight and other men but he opines that her “long continual association as has been described by the witnesses and in most part admitted, leaves little for the Court’s imagination” and if she “did not indulge in gross misconduct, she might as well have as far as appearances go.”
 

 While we do not deem it essential to discuss the judge’s ideologies of morality, we think that it is apt to say that a mere recitation of the events leading up to the filing of the charges disclose that the probabilities are that this case would not have reached the Juvenile Court if Mrs. Knight had been willing to continue to live or let her children live with Mrs. Overlees and her husband. But, be this as it may, we pass on to a consideration o£ the important question of law involved.
 

 The question is whether a child, who receives all the care and support required for its health and comfort and who is reared in a refined environment, is a neglected child because its parent is allegedly an immoral person, where the acts of asserted immorality are not committed in the home and the child does not come in contact with the alleged disgraceful conduct. The trial judge answered this question in the affirmative, being of the opinion that a child _ whose parent habitually conducted herself in a disreputable manner (even though the alleged disreputable acts were not brought, into the home) was “without proper guardianship” and therefore a neglected child as. defined by Section 9 of Act No. 30 of 1924, which reads as follows: “The term ‘neglected child’ shall mean any child under 17' years of age, not now, or hereafter, an inmate of a state institution, [1] found destitute, [2] or dependent upon the public for
 
 [1]
 
 ' support, [3] or
 
 without proper guardianshipj
 
 [4] or whose home, by reason of the neglect, cruelty, depravity or indigence of its parents, guardians, or other persons, is. an unfit place for such child, [5] or having' a single surviving parent undergoing punishment for crime, [6] or when found wandering about the streets or roads or anywhere at night, [7] or wandering anywhere alone without being on any lawful' business, [8] or who, in the opinion of the-court, is' entitled to support or care by its.
 
 *184
 
 parent or parents, where it appears that the parent or parents are failing or refusing to support or care for said child, [9] or who habitually begs or receives alms, [10] or who is found living in any house of ill fame or with any vicious or disreputable person or persons, [11] or whose home, by reason of neglect, immorality or depravity on the part of its parent or parents, guardian or other person in whose care it may be, is an unfit place for ^such child, [12] or whose environment is such, or about whose custody a controversy may be such as to warrant the state, in the interest of the child, in assuming or determining its guardianship, or in determining what may be for the best interests of said child.” (Italics and numerals in brackets ours.)
 

 The foregoing provision is, to say the least, inartistically drawn and it is for this reason that we have inserted numerals in the quotation signifying the alleged twelve causes for which a child may be declared neglected. Consideration of these causes will immediately exhibit that some of them are mere repetitions of others — to illustrate, cause (4) has been duplicated in identical language in cause (11). In truth, when all of the various grounds are analyzed, it. will be realized that the Legislature actually intended to group neglected children into three classes, i. e., (1) those who are destitute or homeless either without parents or tutors or where the parents, or tutors aré failing to provide support and care; (2) those children having homes but whose homes are unfit places by reason of the neglect, cruelty, immorality or indigence of their parents or those charged with their care and (3) children with or without homes whose parents or persons responsible for them permit them to wander the streets at night, beg or receive alms, etc.
 

 Viewed in this light, it becomes apparent that the phrase “without proper guardianship” as used in the statute does not acquire the cover-all meaning attributed to it by the trial judge but refers to and is associated with the phrases immediately preceding dealing with destitute children or those dependent upon the public for support. “Guardianship” is a term unknown to the civil law and the fact that it is used throughout Act No. 30 of 1924 is strong evidence that the statute was patterned from a similar act in use in a common-law state. And, as employed in the statute, the phrase “without proper guardianship” is utterly without application to children who have a home provided by their parents. This is made manifest by the fact that the clause following the phrase “without proper guardianship” declares in effect that children with a home may nevertheless be neglected where it is an unfit place by reason of the cruelty, depravity or immorality of the parent or guardian. If the Legislature had intended that the phrase “without, proper guardianship” was 'to be given the broad scope accorded it by the. trial judge, there would have been, no
 
 *185
 
 need whatever for a specific provision dealing with unfitness of the home as a consequence of the cruelty, etc., of the parents.
 

 Thus, we find that the phrase “without proper guardianship” has reference only to cases where there is no parent or other person charged with the legal obligation of caring for the child or to matters where the parents or legal custodians have failed to provide for the child and have allowed it to become destitute or dependent upon the public for support.
 

 This conclusion is fortified by kindred statutes on the subject and by jurisprudence. The definition of a neglected child contained in Act No. 30 of 1924 is practically of the same scope as the definition set forth in Act No. 83 of the Extra Session of 1921, dealing generally with juvenile courts throughout the state, and Act No. 126 of the Extra Session of 1921, which had reference to the Juvenile Court for the Parish of Orleans. Clear evidence of the legislative intent that the phrase “without proper guardianship” (which is found in Acts 83 and 126 of the Extra Session of 1921 as well as in Act No. 30 of 1924) should not be regarded as an omnibus clause to cover every imaginable situation has been but recently exhibited by Act No. 169 of 1944 (applicable to the Juvenile Court for the Parish of Orleans) where a neglected child is defined to be one:
 

 “(a) Who is abandoned by his parent, tutor, guardian or other person or agency having care of the person of the child,
 
 or is otherwise without proper custody or guardianship;
 
 or
 

 “(b) Whose parent, tutor, guardian * * * neglects or refuses to provide or avail himself of proper or necessary subsistence, education, medical or surgical care, or other care necessary for the child’s health, morals or well-being; or
 

 “(c) Whose parent, tutor, guardian * * * neglects or refuses to provide or avail himself of the special care made necessary by the child’s mental condition ; or
 

 “(d) Who associates with vagrants or with vicious or immoral persons; or
 

 “(e) Who engages in an occupation or is in an environment dangerous to life or limb or injurious to the health or morals of himself or others * * *
 

 See Section 4 of Act No. 169 of 1944.. (Italics ours.)
 

 Note the limited scope of the-phrase “without proper custody or guardianship” as used in paragraph (a) of the above-quoted definition. It is associated only with a clause having reference to-abandonment by the parent, etc. Accordingly, its operation is restricted to abandoned children or those without parents or legal custodians. Noscitur a sociis. Thus, the last expression of the legislative will
 
 [2]
 
 ’
 
 *186
 
 makes it patent that the phrase “without proper guardianship” as used in the prior statutes is to be associated with and applicable to abandoned or destitute children and not those provided with a home.
 

 An interesting case on this subject, wherein a similar statute was construed, is that of Orr v. State, 70 Ind.App. 242, 123 N.E. 470, 472, decided by the Indiana Appellate Court in 1919. There, it appeared that Harry B. Orr and his wife, Kathryn E. Orr, resided in Howard County, Indiana, with the parents of the husband; that three children were born of the marriage, the youngest being Villa Kathryn; that Harry Orr had suffered a nervous breakdown, had been committed to an insane asylum and subsequently was permitted to return to the home of his parents where his wife and children were residing; that, after his return, Kathryn Orr abandoned the home and went to live with her mother in Pittsburgh, Pennsylvania, and that, a year or so after the departure of the wife, the grandparents filed an affidavit in the Circuit Court to have Villa Kathryn, the youngest child of the marriage between their son and daughter-in-law, declared to be a neglected child under Burns’ Ann.St. of 1914, Section 1643. The record revealed that, at the time the proceeding was instituted and prior thereto, Villa Kathryn had been residing at the home of the grandparents and that the grandfather brought the proceeding because he feared that the mother might claim the child.
 

 Section 1643, Burns’ Statutes of Indiana 1914, is practically identical with Section 9 of Act No. 30 of 1924. It reads as follows : “The words ‘neglected child’ * * * shall mean any boy under the age of sixteen (16) years or any girl under the age of seventeen (17) years, [1] who has not proper parental care or guardianship; [2] or who habitually begs or receives alms; [3] or who is found living in any house of ill fame, or with any vicious or disreputable persons; [4] or who is employed in any saloon; [5] or whose home by reason of neglect, cruelty or depravity on the part of its parent or parents, guardian or other person in whose care it may be, is an unfit place for such child; [6] or whose environment is such as to warrant the state, in the interest of the child, in assuming its guardianship.”
 

 In the lower court, there was judgment declaring the child to be neglected within the meaning of the above-quoted statute and ordering that the Probation Officer placed her in the care and custody of her grandparents (the complainants) until further orders of the court. On the appeal of the mother, the judgment was reversed, the appellate court being of the opinion that, since the child was in a good home,
 
 *187
 
 she could not be considered neglected in any sense of the word. The grandparents contended that the mother was an unfit person (having had immoral relations with. men) and that, since the father was insane, the child was “without proper parental care or guardianship”. In refusing to uphold this contention the court said: “With respect to clause 1 of this section of the statute, it might be contended that, since the father is insane and the mother away, the child is without proper parental care. But that contention is excluded by the undisputed evidence and the facts found by the court.
 
 The child was left by the mother in the custody of its
 
 grandparents,
 
 who have so great affection for the little girl that they desire to keep her even to the exclusion of the mother
 
 * * * ”, (Italics ours.)
 

 The court further found that the action of the trial judge in permitting the child to remain in the care of the grandparents after it found her to be neglected was most inconsistent. (The same situation exists in this case as the court has allowed Mrs. Knight to retain the custody of the children although it finds them to be neglected because of her immorality and depravity.) With reference to such a paradox, the Court of Appeal of Indiana observed: “The action of the trial court is strangely contradictory. Evidently the trial court was of the opinion that the home in which the child was living was ‘altogether satisfactory,’ for he immediately recommitted the child to that home. If the trial court had found that the grandfather’s home was-not a suitable place for the child, and that the child’s environment was bad because of the constant presence of its unfortunate, but insane, father, we could understand that the court was endeavoring to promote the welfare of the child. But as the record stands, it is too clear for any difference of opinion that the controversy in reality is-between the child’s grandfather and its-mother. The law provides ways by which such controversies may be properly presented and determined, but the statutes under which the proceeding was ostensibly brought cannot be used for that purpose.”'
 

 The same situation is presented here — for it is manifest that the grandmother in her chagrin is attempting to use the Juvenile Court as a forum to recover the possession of the children of Mrs. Knight. Her hope to regain the care of the little girls cannot be satisfied where the proof shows that these children are neither neglected in fact nor in law.
 

 The judgment appealed from is reversed and the proceeding is dismissed.
 

 HAMITER, J., concurs in the decree.
 

 [1]
 

 The colored maid was hired because Mrs. Knight has been employed for some time as a telephone supervisor with the Southern Bell Telephone Company at Shreveport.
 

 [2]
 

 The fact that this statute applies only to the City of New Orleans is of no consequence for purposes of determining legislative intent as it cannot be seriously
 
 *186
 
 contended that the Legislature designed that powers .of a particular juvenile court be far more extensive than other juvenile courts in the absence of clear provisions to that effect.