LARRY AND SCOTT H...., IN RE.

Juvenile Court, Cuyahoga County.

No. 199391.   Decided February 20, 1963.

Mr. John T. Corrigan, prosecuting attorney, and Mr. Leo Spellacy, for the petitioner, The County Welfare Department. Miss Jean Murrell Capers, for the Mother of the Children.

WHITLATCH, J. This cause came on for hearing on the petition of Mary E. Forbes, case worker for the Cuyahoga County Welfare Department, alleging that Larry and Scott H...., minors, ages five and four years, are dependent children, "in this that the condition or environment of the children is such as to warrant the State in the interest of the children in assuming their guardianship and that said children lack proper care by reason of the mental condition of their mother."

Larry and Scott H.... are the illegitimate children of Norma H....; they live with her in a three-room apartment in the Central area of Cleveland. The paternity of the children has not been legally established and the whereabouts of Mr. J...., the alleged father, is unknown. Mrs. H.... divorced her husband in 1954 and subsequently lived illicitly in Kansas City, Missouri with Mr. J...., who moved with her to Cleveland in 1956. Their association was discontinued in 1958; since that time, Mrs. H.... has apparently led a moral life. The petitioner testified that the housekeeping standards of Mrs. H.... were "fair." Witnesses for Mrs. H.. .. testified that her home was clean, that she took good care of the boys and that they were generally neat and clean. The court interviewed the two boys who gave the appearance of being healthy, happy, outgoing children.

The only suggestion of improper care was the testimony of the petitioner that the mother had told her that on occasions, as punishment, she had sent the boys to bed without their dinner and that on these occasions she had given the boys vitamin pills in lieu of their meal. The mother also admitted that she had whipped the boys with a small strap; but this does not appear to have been excessive. Larry's school report card shows him to be a well adjusted boy who is receiving better than average grades.

Three psychiatrists testified as to the mother's mental condition. Dr. L...., the Court's psychiatrist, testified that from his examination and from the records of the Mount Sinai Hospital Psychiatric Clinic that the mother was "a chronic paranoid schizophrenic and she should be considered as completely and totally inadequate and incapable of handling the two children now with her." Dr. G...., who had seen the

mother when she was in psychotic episode in November 1961, likewise diagnosed the mother as a chronic paranoid schizophrenic. At the time of his examination, the mother manifested delusional symptoms. She said, among other things, that Scott had been a fetus in the time of Moses and that he was aborted in the fourth month and his soul was imprisoned until released in her womb. She further said that Larry came from a camel tribe and was destined to do great things in the world. At the hearing in June of 1962, the mother was apparently free from these delusions and denied that she had ever had them. When asked if the mother's mental condition would prevent her from giving the children proper care, Dr. G.... answered that he did not know. Dr. G.... further testified that if the children were removed from the mother it might be necessary to hospitalize her since she might then become "an acute schizophrenic."

The third psychiatrist, Dr. D....., who examined the mother at the request of counsel for the mother, originally reported that he found "no evidence of a psychosis, a character disorder or a neurosis which would make it physically or emotionally unsafe for her children to be reared by her." However, after examining the medical records of Mount Sinai Hospital and conferring with Dr. L.... and Dr. G...., he re-examined the mother and found her partially recovered from a schizophrenic psychotic reaction. Dr. D.... testified that many who recover from such a psychosis are quite capable of caring for children but from his examination of the mother he had reason to doubt her capability. The mother did not take the witness stand but, with consent of counsel, the Court conferred with her privately. During this interview, the mother was completely rational although she did exhibit considerable tenseness. She denied ever having experienced the delusions reported by Dr. G...... The Court was unable to determine whether she was controlling enough not to mention the delusions, although possessed of them, or whether she was now free of the delusions and had no memory of ever experiencing them.

The Court also had available for consideration the recommendations of two professional social workers who were completely familiar with the psychiatric opinions related above and the social investigation relative to Mrs. H....'s background.

They were poles apart in their conclusions. One recommended immediate removal of the children from the mother's home, maintaining that the mother's mental condition made it dangerous for a social worker to visit her home. The other social worker advised leaving the children with the mother, with a social worker making periodic visits in the home to supervise the mother's care of the children and to protect them from her if necessary.

The petitioner contends that in the best interest of the children they should be removed from their mother and since the mother's condition is claimed to be "chronic" it is clearly implied that the separation should be a permanent one. If the children are adjudged dependent, the Court has the authority (Section 2151.35 [B], Revised Code), to commit them to the permanent custody of the County Welfare Department or another certified child-caring agency, which agency in turn would then be authorized to surrender them for adoption (Section 3107.06 [B] [1] & [D], Revised Code).

It is contended that the immediate removal of the children from the mother's care is in the best interest of the children. "The Juvenile Court Judge may not make a disposition of a child just because it seems like a good thing to do." Monrad Paulsen—Minn. Law Rev. Vol. 41, pg. 555. The Court is required by law to act in the best interest of the child but this requirement applies *only* to the child who has been legally determined to be within the Court's jurisdiction. As was said in *In re Coyle*, 122 Ind. App., 217, 101 N. E. (2d), 192 (1951):

"Juvenile Court procedure has not been so far socialized and individual rights so far diminished that a child may be taken from its parents . . . . . . . simply because some court might think that to be in the best interests of the state . . . . . . ."

The abundance of authority giving a parent the paramount right to the custody of his child scarcely needs reiteration. This elemental proposition is succinctly stated in 39 American Jurisprudence, 603:

"Clearly, there is a point beyond which the state may not constitutionally go in interfering with the natural liberty of parents to direct the upbringing of their children. Parental authority, it is said, is an emanation from God, and every attempt

to infringe upon it, except from dire necessity, should be resisted in all well governed states...... In fact, it has been declared that the state has no higher welfare than to have children reared by their parents, free government being instituted for the protection and benefit of parenthood as one of the natural rights of citizenship.''

That Ohio cherishes this high concern for parenthood is clearly indicated in Section 2151.55, Revised Code, as follows:

''The purpose of Sections 2151.01 to 2151.54, inclusive, Revised Code, is to secure for each child under the jurisdiction of the Juvenile Court such care, guidance, and control, *preferably in its own home*, as will best serve the child's welfare........'' (Emphasis added.)

Before this Court can make any disposition of these children, they must be brought under the jurisdiction of the Court by an adjudication of dependency as defined by Section 2151.04 (B) & (C), Revised Code.

Are Larry and Scott H.... dependent children?

Section 2151.04, Revised Code, in so far as applicable provides as follows: ''As used in Sections 2151.01 to 2151.54, inclusive, Revised Code, 'dependent child' includes any child:

''(A) ....................

''(B) Who lacks proper care or support by reason of the mental or physical condition of his parents, guardian, or custodian;

''(C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming his guardianship.''

Are the children dependent in that they lack proper care because of the mental condition of the mother? The mother has never been adjudged mentally incompetent and we do not suggest that such a proceeding is a necessary prerequisite to a finding of dependency under (B) above. However, it would seem that at least the same degree of proof would be necessary to prove mental incapacity to care for children as would be necessary to prove mental illness or deficiency. Moreover, under this dependency provision, it would appear to be necessary for the petitioner to produce not only evidence of the mother's mental incapacity, but also evidence showing that the

children *lacked "proper care"* because of the mental incapacity. Here the evidence of lack of proper care is meager almost to the point of being non-existent. We would not consider the mother's means of punishing the children either cruel or unusual. While the law will not countenance unconscionable physical chastisement, the mother's use of the small strap does not fall in that category. Certain are we that in many American homes children are occasionally sent to bed without their dinner as punishment for misbehavior.

Is the "condition or environment" of the children such as to warrant the state, in the interest of the children, in assuming their guardianship? The Court's psychiatrist was of the opinion that the mother's mental condition made her actions unpredictable and that she could be a source of danger to her children, especially so since her children were involved in her delusions. One doesn't need special training in psychiatry to know that the mental illness of a mother could effectively destroy the parent-child relationship and could greatly impair the mother's ability to nurture and rear her children and thus make for a condition "that, in the interest of the children, would warrant the state in assuming their guardianship."

We find no Ohio decisions relating to removing a child from the care of its parent because of the mental illness of the parent. We do find a helpful annotation on this subject in 74 A. L. R. (2d), 1073, where it is said at page 1075:

"The Courts have not prescribed any special formulas for resolving custody questions where the mental health of the parent seeking custody is challenged. Clearly, a parent who is an adjudged incompetent, incurably insane, or a patient in a hospital for the mentally ill is not a fit custodian of children. But for the not-so-clear cases, Courts seek expert opinion, and, with the welfare of the child as the foremost consideration, weigh mental health carefully against the other factors. From the results of the cases, rather than from the statements of the Courts, *it would seem that Courts are a little more reluctant to give custody of children to strangers rather than a parent, on grounds of mental health, than they are to give one parent custody when the mental health of the other is in doubt."* (Emphasis added.)

That the "Courts are a little more reluctant to give cus-

tody to strangers rather than a parent on the grounds of mental health'' is not difficult to understand. In a custody contest between parents we are not called upon to deprive a parent of the natural and legal right to custody. Rather we are deciding which of the two parents should have the custody. Under Ohio law in a custody contest the parents stand in equality (Section 3109.03, Revised Code), and as between the two parents the judgment is made in accordance with the best interests of the child. As was said in *''In re Konneker,''* 30 Ohio App., 502:

''At the very outset it should be remembered and kept in mind that cases arising under juvenile law are not to be confused with cases in which the controversy arises between those seeking the custody of children in divorce or habeas corpus cases (*Orr* v. *State*, 70 Ind. App., 242, 123 N. E., 470), and also that this type of case is not the ordinary adversary proceeding in which there is a plaintiff and a defendant.''

In the case at bar, we are asked to take the children from their mother and place them with strangers. The mother has not been adjudged incompetent, she is not a patient in a mental hospital. Although her condition is described as ''chronic,'' the psychiatrists are divided in their opinions as to the curability of her condition. Dr. L...., the Court psychiatrist, is unequivocal in his opinion that the children should be removed from their mother's care. Dr. G.... quite frankly states that he doesn't know whether or not the mother can properly care for the children. Dr. D.... stated that he had reason to doubt that the mother could take care of the children. One social worker recommended immediate removal of the children from the mother's care, while another was of the opinion that the children should remain with her.

As in no other Court, the judge in the Juvenile Court must take under consideration the opinions of psychiatrists, psychologists and social workers. But this is not to say that they are charged with the responsibility of making the judge's decision. The distinction between the role of the judge and the clinician must not be blurred. It is the clinician's job to make findings and recommendations; it is the judge's job to make the decision after careful consideration of the clinical reports and the evidence in the case. See ''The Juvenile Court

Judge's Job" by Judge Harry L. Eastman, N. P. P. A. Journal, Vol. 5, No. 4, Oct. 1959.

We instruct juries that the testimony and the opinions of experts are not to supplant but to supplement their judgment; this instruction has equal application to the judge when he sits as the trier of the facts in a dependency proceeding. The Court is not required to accept the theory or opinion of an expert as conclusive of the issues of fact raised by the pleadings and the evidence. *Bahl* v. *Byal*, 90 Ohio St., 129; *Haas* v. *Kundtz*, 94 Ohio St., 238. Here the expert opinion is divided and while it is most helpful to the Court in accentuating the gravity of the Court's problem it is not immediately helpful in formulating a final decision. It is the opinion of the Court that a longer period of observation both by psychiatrists and social workers is necessary for the final disposition of this case. The diagnosis of all three psychiatrists was based to a large extent on the mother's mental condition when examined at the Mount Sinai Clinic six months before their testimony was adduced in Court. As was said in "*In re Kronjaeger*," 166 Ohio St., 172, 140 N. E. (2d), 773:

"The determination of the lack of proper parental care. . . . as a basis for a finding that a child is neglected. . . .must be made as of the time of the hearing on the charge of neglect."

It would seem that the existence of the condition of dependency must also be made as of the time of the hearing on the charge. The court must have expert advice on the mother's mental condition as of the time his decision is made.

The Court therefore arranged for Mrs. H.... to be seen at the Fairhill Psychiatric Hospital at weekly intervals for further evaluation of her mental condition and for supervision of the children in Mrs. H....'s home by an experienced social worker who was to make frequent unannounced calls in the home. With the consent of counsel, the Court's decision was postponed pending final reports from the psychiatrist and the social worker.

At the conclusion of a seven-month period, the hospital psychiatrist, Dr. R...., reported that Mrs. H....'s "adjustment appears to be entirely satisfactory" and that the "case can be discontinued." The social worker reported that the

mother was giving the children "excellent care," that continued close supervision of the case was no longer necessary and that the County Welfare Department would continue to see the family as an incident of relief administration.

Upon full consideration of all the evidence including the testimony of the lay and expert witnesses, the clinical reports and the Court's conferences with Mrs. H.... and her children, we conclude that there is not sufficient evidence to sustain the petition. Thus the processes of psychiatry and social work coupled with due process of law permit the children to remain with their mother, when to remove them could result in traumatic maternal deprivation for the children and an acute schizophrenic breakdown for the mother. Larry and Scott H.... are found not to be dependent children.